**AFFIRMED and Opinion Filed October 12, 2022**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-21-00999-CV

### IN THE MATTER OF D.C.H., A JUVENILE

**On Appeal from the County Court at Law No. 2**
**Rockwall County, Texas**
**Trial Court Cause No. J-19-0027**

## MEMORANDUM OPINION

Before Justices Myers, Pedersen, III, and Garcia
Opinion by Justice Garcia

D.C.H., a juvenile, appeals an order of adjudication and judgment of disposition finding him delinquent for the offense of indecency with a child by sexual contact. He raises one issue challenging the sufficiency of the evidence to support the intent element of the offense, emphasizing that he was only eleven years old at the time. We affirm.

### I. PROCEDURAL BACKGROUND

In September 2019, the State filed an original adjudication petition alleging that appellant violated Texas Penal Code § 21.11 by touching the genitals of a child under the age of seventeen with his hand, with the intent to arouse and gratify his

sexual desire. Evidence at trial would show that appellant was eleven at the time of the alleged offense and the complainant was seven. The State amended the petition three times, but its allegations remained largely the same.

Appellant pleaded not true and waived his right to a jury trial. After a three-day bench trial, the trial judge signed an order of adjudication in which she found that appellant committed indecency with a child by sexual contact and declared appellant a "Child Engaged in Delinquent Contact as defined in §51.03 of the Juvenile Justice Code." The trial judge later signed a judgment of disposition that placed appellant on probation for two years.

Appellant timely appealed.

## II.   ANALYSIS

### A.   Appellant's Issue

In his sole issue, appellant argues that the evidence is insufficient to support the finding that he acted with the intent to arouse or gratify his sexual desire.

### B.   Applicable Law and Standard of Review

The Juvenile Justice Code, which is Title 3 of the Texas Family Code, governs the proceedings in all cases involving delinquent conduct by a person who was a child (meaning a person at least ten years old but under seventeen years old) at the time of the conduct. *See* TEX. FAM. CODE ANN. §§ 51.02(2)(A), 51.04(a). The Code defines delinquent conduct as, among other things, "conduct, other than a traffic

offense, that violates a penal law of this state . . . punishable by imprisonment or by confinement in jail." *Id*. § 51.03(a)(1).

In a juvenile proceeding, the trial court must conduct an adjudication hearing so that a factfinder can determine whether the juvenile engaged in delinquent conduct. *In re I.F.M.*, 525 S.W.3d 884, 886 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing FAM. § 54.03). If the factfinder determines that the juvenile engaged in delinquent conduct, the trial court must then conduct a disposition hearing. *Id*. (citing FAM. § 54.03(h)). This hearing is akin to sentencing. *Id*.

The burden of proof at the adjudication hearing is the beyond-a-reasonable-doubt standard applicable in criminal cases. *Id*. (citing FAM. § 54.03(f)). Accordingly, we review the sufficiency of the evidence in the adjudication of a juvenile case under the standard applicable in criminal cases. *In re M.C.*, 237 S.W.3d 923, 926 (Tex. App.—Dallas 2007, no pet.). We view the evidence in the light most favorable to the factfinder's determination to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Id*. The factfinder is entitled to believe the testimony of one witness over that of another, and it is the factfinder's province to resolve conflicts in the evidence. *See id*. at 927.

The offense involved in this case is indecency with a child by sexual conduct under Texas Penal Code § 21.11. Under the circumstances of this case, the State was required to prove that (1) the complainant was younger than seventeen years of age,

(2) appellant touched, including touching through clothing, any part of the complainant's genitals, and (3) appellant committed the act with the intent to arouse or gratify the sexual desire of any person. *See* TEX. PENAL CODE ANN. § 21.11(a), (c).

"Intent may be inferred from the accused's actions, words, and conduct as well as surrounding circumstances." *In re A.E.B.*, 255 S.W.3d 338, 343 (Tex. App.—Dallas 2008, pet. dism'd) (juvenile case). This principle applies to juveniles accused of indecency with a child. *See, e.g.*, *In re D.B.*, No. 2-03-110-CV, 2003 WL 22862571, at *4 (Tex. App.—Fort Worth Dec. 4, 2003, no pet.) (per curiam) (mem. op.) (juvenile was roughly twelve at time of misconduct); *A.R.S. v. State*, No. 14-00-00237-CV, 2001 WL 930806, at *2 (Tex. App.—Houston [14th Dist.] Aug. 16, 2001, no pet.) (not designated for publication) (juvenile was twelve at time of misconduct).

## C.    The Evidence

In the following discussion, we use pseudonyms to refer to all of the persons involved. *See* TEX. R. APP. P. 9.8(c). Again, at the time of the incident in question, appellant was eleven years old. The complainant, Page, was seven years old.

### 1.    Background Facts

In or before 2017, Page's mother, Mary, began a romantic relationship with appellant's father, John. Mary had two children from a prior marriage: Page and her younger brother Sam. John also had two children from a prior relationship: appellant

–4–

and his younger brother Kevin. In late 2017, John moved into Mary's house. In January 2018, John and Mary got engaged. In roughly June 2018, appellant and Kevin moved in with John, Mary, Page, and Sam.

The evidence suggests that appellant had been diagnosed with ADHD and ADD before Mary met him. Mary testified that after she started to be around appellant more, she began to think he had autism rather than ADHD. She raised the issue in spring 2018. John also testified that appellant was autistic. He further testified that appellant received treatment from specialists in 2019 and was having "difficult behaviors" around that time.

### 2. Evidence Regarding the Incident

Mary testified that appellant and Page got along relatively well but that appellant was not "touchy-feely" or affectionate with Page. But on the evening of Friday, March 8, 2019, Mary noticed something unusual. Page was sitting on a living-room couch with an iPad, and as Mary "rounded the corner, [appellant] was draped over [Page] and had his arms wrapped around her." Mary "kind of asked what was going on because it was very odd since he did not ever hug her or show her affection like that previously." Page "kind of just, like, shrugged it off and was, oh, I like hugs." Mary told appellant to go to bed and he did.

Page testified that on the morning of Saturday, March 9, 2019, John was at work and the rest of the family was home. Mary testified that she got the children up because appellant had a guitar lesson that morning, and she took a shower while the

children were eating. When Mary got out of the shower, she heard Page say, "[N]o, stop, [appellants name]." The door to Page's bedroom was closed, and Mary went to the door and opened it. When she did, appellant "popped up." Mary asked him what he was doing in Page's room, and he said that they were watching her iPad. Mary said that he was not supposed to be in Page's room, especially with the door closed, and that he needed to go back to his room. Mary had Page sit on the couch while Mary finished getting ready.

Page testified to the following events, which apparently occurred on March 9, 2019, shortly after the episode just described. Page went into the bedroom that appellant and Kevin shared. Appellant and Kevin had a bunk bed, and Sam and Kevin were on the top bunk. Appellant was sitting on the bottom bunk. Page asked appellant if he wanted to watch videos on her iPad, and appellant said sure. Page got into the bottom bunk and got under a comforter because it was cold. Appellant also got into the bed and under the comforter. They started watching videos on her iPad. Appellant, who was leaning towards Page on his left side, then moved his right hand towards Page. His hand was "hovering" or "floating" over Page's "area," meaning the part of her body between her legs that she peed with. Page was wearing underwear and shorts, and one or two of appellant's fingers touched her skin under her underwear. She "felt something moving, and it made a really strong tingle go up [her] back." She flipped the covers back so they weren't covering that part of her body anymore, and that "caused his hand to immediately come out fast of my

–6–

under—under my underwear." Appellant's hand was under her underwear for about twenty or thirty seconds. Then appellant put his hand back, this time between Page's pants and her underwear. This time, appellant's hand stayed still. Page moved the blanket around so that "his hand would come out." At about this time, Mary came into the room and told appellant to get away from Page. Page then went to her bedroom.

Mary testified that she noticed that Page was not on the couch and that "she was in the boys' room." Mary went towards appellant and Kevin's room, and she could see Sam and Kevin on the top bunk playing video games. She also saw Page "laying on the inside of the bed next to the wall . . . and [appellant] was on the outside of her kind of leaned over on his left side, and his hand was making the covers move on her private area." A dark blue comforter was over Page and appellant, and she saw that appellant's hand was making "[l]ike a circular motion" under the comforter. She could not actually see his hand because it was under the covers, but it appeared to be "[i]n [Page's] private area" and between Page's legs. Mary got Page out of the room and told appellant to sit on the couch in the living room. Mary called John and then talked to Page about what had happened. When asked what Page told her, Mary testified:

> She told me he put his hand beside her pants and tried to tug. She did a movement to make him stop. He did it again and then continued to rub in her private area.

Mary also testified that Page told her that appellant's hand was over her shorts or underwear.

Mary testified that John arrived at the house about twenty minutes after Mary contacted him. He immediately began spanking appellant with a wooden paddle and said, "[Y]ou know what you did." John refused to talk to Mary and told appellant and Kevin to pack their stuff because they were leaving. They packed in about twenty or thirty minutes, and John's brother came to pick appellant and Kevin up. John left then as well. Mary contacted Page's father, and they agreed to take Page to a doctor on Monday.

On the same day, John and Mary continued to communicate by text message after John left. Mary testified that John's texts made her think that John was not all that surprised about what had happened and that appellant "had previously done it to somebody else." On cross-examination, John testified that he remembered sending Mary a text that said:

> I am not mad at you or anyone other than [appellant]. I kept denying that this would ever happen—that this would ever again [sic], and I can't let them go back to their mom's because that's where it started, and I can't have him around [Page] at all to protect her and you. I'm so sorry this has happened. I love you and the kids with all my heart.

An investigation, including forensic interviews with Page and appellant, later took place.

At trial, appellant testified in his own defense that he found Page in his bed when he went into his room, that he told her to leave but she did not, and that he

tried to grab the covers. He also testified that his hands never went under the covers and that he had never inappropriately touched another person.

### 3. Evidence Regarding Appellant's Sexual Knowledge, Maturity, and Possible Prior Abuse

When asked if she knew how sexually developed appellant was as of March 2019, Mary testified, "I know he was hitting puberty, getting to that point, yeah." She also testified that appellant rode the bus with a girl that he called his "girlfriend." She did not remember ever catching appellant looking at pornography, and she had no specific knowledge that he ever masturbated, although he was "in the bathroom sometimes for long amounts of time." She testified that John told her that he had talked to appellant "about the birds and the bees."

John testified that he had never talked to appellant about sex, that he had never seen appellant look at pornography or masturbate, and that he had never heard appellant use sexually explicit language. Appellant had not achieved puberty at the age of eleven. At or before age eleven appellant never expressed any curiosity about sex to John. Although appellant had "outbursts," they were not sexual in nature. The State introduced into evidence a medical record indicating that John had told someone that appellant experienced abuse when he was six or seven, but John testified that he did not say that to the doctor or anyone in her office. John also denied that he told appellant's forensic interviewer that "something had happened to [appellant] by an older stepbrother." But he testified that "[t]here was an incident that—that [appellant and his stepbrother] ran into each other naked at their mom's

house." At that time, appellant was five or six, and his stepbrother was maybe a year younger.

John's friend Sharon testified that she has known appellant his whole life. When appellant was about six years old, Sharon had a conversation with him about "inappropriate touching." On that occasion, Sharon's roughly three-year-old daughter had crawled into bed with appellant, and Sharon found them asleep together. Sharon testified that she was not claiming that appellant inappropriately touched her daughter when he was six years old. She also testified that she did not believe that appellant inappropriately touched Page.

Appellant testified that as of the time of the incident, his parents had not talked to him about sex and he did not know what sex was. He had never seen a naked girl or a naked woman, nor had he seen a pornographic movie or magazine. He did not know the meaning of the term "masturbate." When he was eleven, he did not have any hair or fuzz on his face, nor did he have any hair under his arms or in his private areas. He was fourteen at the time of trial, and he testified that he had a little fuzz on his face and some hair under his arms and on his private areas. He denied that he had ever been touched inappropriately by anyone.

On rebuttal, the State called the licensed professional counselor who conducted a forensic interview of appellant in March 2019. The counselor testified that, according to his records, John disclosed that appellant was abused once by an older stepbrother when appellant was about six years old, and John went on to say

that the family intervened immediately and nothing has happened since. John had previously testified that appellant did not have an older stepbrother.

## D.       The Parties' Contentions

Appellant concedes that it is reasonable to infer the necessary intent for indecency with a child by sexual contact when the offender is an adult, but he argues that the inference is less reasonable when the offender is a prepubescent child. He cites several out-of-state cases that have adopted this premise and reversed sexual-contact-based delinquency findings against children roughly appellant's age. This discussion from a recent Colorado case is typical:

> Whether a juvenile acted for the purpose of sexual gratification must be determined on a case-by-case basis. The trier of fact must consider all the relevant circumstances, including the juvenile's age and maturity, before it can infer the requisite intent. It may not—and often will not—be appropriate for a fact finder to ascribe the same intent to a juvenile's act that one could reasonably ascribe to the same act if performed by an adult.

*People ex rel. J.O.*, No. 20CA1539, 2022 WL 2164756, at *5 (Colo. App. June 16, 2022).[1] The court went on to state that in such cases a delinquency finding must be supported by evidence beyond the sexual contact itself, and it identified several kinds of evidence that could suffice, such as "removing clothing, heavy breathing, placing the victim's hand on the accused's genitals, an erection, other observable

---

[1] Appellant also relies on cases such as the following: *In re Jerry M.*, 69 Cal. Rptr. 2d 148 (Cal. Ct. App. 1997); *In re M.H.*, 127 N.E.3d 1146 (Ill. App. Ct. 2019); *In re J.A.H.*, 293 S.W.3d 116 (Mo. Ct. App. 2009); *In re T.S.*, 515 S.E.2d 230 (N.C. Ct. App. 1999); *People ex rel. W.T.M.*, 785 N.W.2d 264 (S.D. 2010); *In re Stephen T.*, 643 N.W.2d 151 (Wis. Ct. App. 2001).

signs of arousal, the relationship of the parties, sexually explicit comments, coercing or deceiving the victim to obtain cooperation, attempting to avoid detection, or instructing the victim not to disclose the occurrence." *Id*. Appellant argues that the evidence established that he was prepubescent at the time of the incident and that he had shown no interest in sex up to that time, and he concludes that there was no evidence showing any facts, such as those listed in *J.O.*, indicating that he had the required intent in this case.[2]

The State argues that the evidence supports an inference that appellant acted with the required intent, relying principally on the evidence that appellant deliberately touched Page under her underwear, he quickly pulled his hand out of Page's clothing when she moved the covers, and he put his hand back into Page's shorts after pulling it out.

In his reply brief, appellant again argues that the State failed to show that the evidence supports a reasonable inference that appellant acted with the necessary intent. He argues that even if the evidence supports an inference that appellant knew that his contact was wrong, that is not the same as proving that appellant acted with the intent to arouse or gratify his sexual desire. *See In re J.A.H.*, 293 S.W.3d 116,

---

[2] Appellant also argues that the State's closing argument improperly shifted the burden of proof onto him to disprove the requisite intent. But he does not raise an independent issue asserting that the State's closing argument itself constituted reversible error. Rather, he argues that the State's closing argument reveals the State's awareness that its evidence of appellant's mental state was insufficient.

121 (Mo. Ct. App. 2009) (drawing this distinction in case involving an eight- or nine-year-old offender).

### E.     Application of the Law to the Facts

In determining whether appellant possessed the requisite intent when he committed the conduct in question, we consider his conduct, anything he said, and all the surrounding circumstances. *See In re A.E.B.*, 255 S.W.3d at 343. Considering all the evidence in the light most favorable to the trial judge's finding, we conclude that the judge could reasonably find beyond a reasonable doubt that appellant possessed the requisite intent.

First, the evidence supports the premise that appellant suddenly displayed a new interest in physical contact with Page shortly before the incident. Mary testified that on the evening of March 8, 2019, she found appellant "draped over" Page, with his arms wrapped around her. She found this incident "very odd since [appellant] did not ever hug her or show her affection like that previously." Then, shortly before the incident on March 9, 2019, Mary heard Page say, "[N]o, stop, [appellant's name]," and then discovered appellant in Page's bedroom with the door closed. This happened despite Mary's rule that the boys were not allowed to be in Page's room. From this evidence, the trial judge could reasonably infer that appellant had developed an interest in physical contact with Page just before the incident in question.

Next, the evidence about the incident itself supports an inference that appellant acted with the necessary intent. The evidence supports an inference that appellant put his hand on Page's private area, beneath a comforter and her shorts and underwear, only a few minutes after she got into his bed. Page "felt something moving, and it made a really strong tingle go up [her] back." This contact lasted twenty to thirty seconds and ended only when Page flipped the covers. Appellant immediately pulled his hand out, but within a few minutes he put his hand back into her shorts, and this second contact ended only when Mary entered the room. Although Page said that appellant kept his hand still on this second contact, the trial judge could choose to believe Mary's testimony that she saw the covers moving in a circular motion when she entered the room. Particularly in light of appellant's unusual conduct the previous evening and earlier that morning, the trial judge could reasonably conclude from all this evidence—extended skin-to-skin contact with Page's private area, appellant's repeating the conduct soon after removing his hand when Page flipped the covers, and the motions that appellant made with his hand— that appellant's motive involved the desire to arouse or gratify his sexual desire.

Appellant emphasizes his alleged prepubescent state and sexual ignorance at the time of the incident, but the evidence of these matters is not unequivocal. Although appellant adduced evidence that he was ignorant of sexual matters as of March 2019, Mary testified that John told her before then that he had talked to appellant about "the birds and the bees." She also testified that appellant referred to

a girl he rode the bus with as his "girlfriend." And although appellant testified that as of March 2019 he had no facial hair or other body hair characteristic of puberty, Mary testified that as of that date she knew that "he was hitting puberty, getting to that point." Finally, although in his testimony appellant denied being either the perpetrator or the victim of inappropriate touching and also essentially denied having any knowledge about sex, it was the trial judge's prerogative to believe or disbelieve appellant's testimony. *See In re D.H.*, No. 05-04-00906-CV, 2005 WL 1663199, at *3 (Tex. App.—Dallas June 24, 2005, no pet.) (mem. op.) ("[T]he fact finder is the exclusive judge of the witnesses' credibility and the weight to be given to their testimony.").

Ultimately, appellant's age is only one of the many circumstances the trial judge could consider in determining whether appellant possessed the requisite intent. Although we have found no similar Texas cases involving a juvenile as young as eleven, we have held the evidence of intent sufficient in a child-indecency case involving a twelve-year-old offender. *See In re Z.L.B.*, 56 S.W.3d 818, 820–21 (Tex. App.—Dallas 2001), *rev'd on other grounds*, 102 S.W.3d 120 (Tex.) (per curiam), *on remand*, 115 S.W.3d 188 (Tex. App.—Dallas 2003, no pet.). In that case, the twelve-year-old juvenile confessed that he had touched his younger brother's "private" four or five times and that he felt bad about what he had done. *Id*. at 820. We concluded that the evidence of the requisite sexual intent was sufficient based on the specific touching that took place, the evidence that some of the conduct took

place while hidden in a closet, and the evidence that the juvenile and the victim felt bad about it. *Id*. at 820–21. Thus, *Z.L.B.* is fairly similar to this case and supports our conclusion. *See id*.; *see also In re M.M.L.*, 241 S.W.3d 546, 557–59 (Tex. App.—Amarillo 2006, pet. denied) (holding that evidence was sufficient to support finding that twelve-year-old offender possessed requisite sexual intent); *A.R.S.*, 2001 WL 930806, at *2 (same).

We conclude that the evidence of the requisite intent was sufficient, and we overrule appellant's sole issue on appeal.

### III. CONCLUSION

We affirm the trial court's judgment.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

210999F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE MATTER OF D.C.H., A JUVENILE

No. 05-21-00999-CV

On Appeal from the County Court at Law No. 2, Rockwall County, Texas Trial Court Cause No. J-19-0027. Opinion delivered by Justice Garcia. Justices Myers and Pedersen, III participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered October 12, 2022